## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

No. 7:08-CV-36-FL

| | | |
|---|---|---|
| SUSAN K. HARE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on the parties' cross motions for Judgment on the Pleadings [DE's 16 & 24]. The time for the parties to file responses or replies has expired. Accordingly, these motions are now ripe for adjudication. The underlying action seeks judicial review of the final decision by the Defendant denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(b)(1), this matter is before the undersigned for a memorandum and recommendation. For the reasons set forth herein, the undersigned RECOMMENDS that Plaintiff's Motion for Judgment on the Pleadings [DE-16] be DENIED and the Defendant's Cross-Motion for Judgment on the Pleadings [DE-24] be GRANTED.

### Statement of the Case

Plaintiff applied for DIB and SSI on September 10, 2003, alleging that she became unable to work on June 26, 2003. [Tr. 79-81, 318-21]. These applications were denied at the initial and reconsideration levels of review. [Tr. 40-52, 322-29]. A hearing was held before an Administrative Law Judge ("ALJ") on January 24, 2005. [Tr. 355-98]. The ALJ concluded that Plaintiff was not disabled during the relevant time period in a decision dated December 28, 2005. [Tr. 15-39]. On

January 18, 2008, the Social Security Administration's Office of Hearings and Appeals denied

Plaintiff's request for review, thus rendering the ALJ's decision the final decision of the Defendant.

[Tr. 6-9]. Plaintiff filed the instant action on March 24, 2008. **[DE-4]**.

## Standard of Review

This Court is authorized to review the Defendant's denial of benefits under 42 U.S.C. §

405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .

Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary

if they are supported by substantial evidence and were reached through application of the correct

legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of

evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642

(4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether the

Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

2

## Analysis

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. [Tr. 19]. At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: 1) fibromyalgia; 2) bilateral carpel tunnel syndrome; and 3) depression. [Tr. 30]. In completing step three, however, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (1.00 et. Seq., 12.00 et. Seq.). [Tr. 30].

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained

the residual functional capacity ("RFC") to perform light work, which would include: 1) lifting twenty pounds occasionally and ten pounds frequently; 2) standing six hours out of eight hours; 3) walking six hours out of eight hours; and 3) sitting six hours out of eight hours. [Tr. 31]. In addition, the ALJ found that Plaintiff can perform frequent balancing, stooping, kneeling, crouching, crawling, handling, and fingering. [Tr. 31]. However, the ALJ also noted that Plaintiff requires a sit/stand option at will, and that she must never be exposed to ropes, ladders, scaffolds, or hazards. [Tr. 31]. Finally, the ALJ stated that Plaintiff must also be limited to low stress environments. [Tr. 31].

A Vocational Expert ("VE") testified at the hearing that despite Plaintiff's limitations, she is capable of making a vocational adjustment to other work that exists in the national economy. [Tr. 37]. After taking all of these factors into account, at step five of his analysis, the ALJ concluded that Plaintiff was not disabled. [Tr. 37-39]. In making his determination, the ALJ cited substantial evidence, a summary of which now follows.

In his decision, the ALJ concluded that some of Plaintiff's alleged impairments were not severe. For example, the ALJ found that Plaintiff's "allegation of disability due to an anxiety disorder is not supported by the clinical evidence of record." [Tr. 28]. Specifically, the ALJ noted that during an examination on July 16, 2003, Plaintiff reported that the Klonopin she had been taking [for her anxiety] was working well and that she ". . . [was] not having any anxiety problems at all." [Tr. 28-29, 236]. In addition, during an examination on June 27, 2003, Plaintiff reported that she was "doing better from an anxiety standpoint" with the Klonopin. [Tr. 238]. As a result, the ALJ stated Plaintiff's anxiety disorder did not qualify as a severe impairment. [Tr. 29].

4

The ALJ also discussed Plaintiff's obesity in relation to the guidelines set forth in Social Security Ruling 02-1p. [Tr. 29]. Specifically, the ALJ cited medical evidence that demonstrated Plaintiff's weight has fluctuated over the past several years, but did not significantly impact her functional abilities. [Tr. 29]. For example: in June 2003, she weighed 228.8 pounds and her electrocardiogram was normal [Tr. 29, 241]; in August 2003 she weighed 226 pounds and there was no diagnosis reflecting obesity or limitations caused by her weight [Tr. 29]; in September 2003, she weighed 219 pounds, had a full range of motion in all extremities, and her gait was normal [Tr. 29, 233]; in October 2003, she weighed 219 pounds [Tr. 29, 229], in November 2003, she had no problems with position changes [Tr. 29, 195]; in December 2003 she weighed 218.8 pounds, and a Holter monitory study was benign [Tr. 29, 227]; in January 2004, she had no problems changing position, and she had a normal gait [Tr. 29, 189]; in June 2004 she had a normal gait [Tr. 29, 207]; in July 2004, her muscle tone was normal and she had a full range of motion in all her joints [Tr. 29, 215]. Based on this evidence, the ALJ concluded that although Plaintiff suffered from obesity, her condition was not severe because the effects of this alleged impairment were so slight that it did not have more than a minimal effect on her ability to perform basic work activities. [Tr. 29].

With regard to Plaintiff's severe impairments, on August 10, 1998, Plaintiff was examined by Dr. Brian Webster and he prescribed Prozac to help her deal with stress at work. [Tr. 19, 262-63]. On September 14, 1998, Plaintiff went to Wilmington Health Associates ("WHA"), and was examined by Dr. Susan Torres. [Tr. 19, 115]. Dr. Torres noted that Plaintiff had a history of fibromyalgia. [Tr. 19, 115]. Plaintiff underwent an electromyogram/nerve conduction study and the results were normal. [Tr. 19, 115].

5

Plaintiff returned to WHA on January 19, 2001. [Tr. 19, 257]. During the examination, Plaintiff reported problems with the Prozac, trouble sleeping, bizarre dreams, and fatigue. [Tr. 19-20, 257]. However, she also stated that the pain that she was experiencing from the fibromyalgia was "not the problem" and reported improvement with the Skelaxin she had been taking. [Tr. 257]. Dr. Webster changed her prescription from Prozac to Celexa and noted that with increased exercise, weight loss, and the change in her prescription, she should start to feel better. [Tr. 19-20, 257]. On October 11, 2002, Dr. Webster noted that Plaintiff was "doing quite well" and her fibromyalgia was stable. [Tr. 20, 248].

On May 6, 2003, Plaintiff was examined by a registered nurse. [Tr. 20]. Her chief complaint was inability to sleep due to bad dreams. [Tr. 20, 242]. Treatment notes reveal that Plaintiff weighed 227 pounds and was oriented. [Tr. 20, 242]. Although Plaintiff was crying, she became calmer as the examination continued. [Tr. 20, 242]. The nurse diagnosed Plaintiff with fibromyalgia and stress/depression. [Tr. 20, 242]. For treatment, the nurse recommended increasing the dosage of the Celexa and also prescribed Klonopin. [Tr. 20, 242].

Plaintiff was examined by Dr. Kevin S. Scully of Atlantic Orthopedics on June 12, 2003. [Tr. 20, 211]. Plaintiff reported pain in her right upper extremity. [Tr. 20, 211]. Examination revealed that Plaintiff had intact reflexes of the biceps, triceps, and brachial radialis. [Tr. 20, 211]. She did not exhibit any muscle wasting or fasciculation. [Tr. 20, 211]. However, she did have abductor weakness on the left and questionable triceps weakness. [Tr. 20, 211]. Dr. Scully ordered an MRI and prescribed Percocet. [Tr. 20, 211]. A follow-up visit was scheduled after the MRI. [Tr. 20, 211].

Plaintiff's MRI was performed on June 18, 2003, and the results were normal. [Tr. 20, 212].

6

The findings indicated that Plaintiff's vertebral bodies were normally aligned, her disc spaces were well maintained, there was no evidence of disc herniation, and her spinal cord and spinal canal were unremarkable. [Tr. 20, 212]. During her follow-up visit with Dr. Scully on June 26, 2003, the doctor discussed the MRI. [Tr. 20, 210]. In addition, because Plaintiff complained of a history of chest pain, the doctor ordered a cardiogram. [Tr. 20, 210]. However, the doctor also noted that he was not convinced that Plaintiff's complaints of pain in her upper extremity were of a musculoskeletal origin. [Tr. 20, 210].

Dr. Scully referred Plaintiff to Dr. Richard Bumgardner of WHA for her complaints of chest pain. [Tr. 20, 241]. During this examination Plaintiff was not in acute distress, she weighed 228.8 pounds, and her EKG was normal. [Tr. 20, 241]. She also had a regular heart rate and rhythm without murmurs and she did not have any edema in her extremities. [Tr. 20, 241]. Based on his exam, the doctor concluded that Plaintiff's symptoms "would be very atypical for any type of cardiac problem," and that coupled with her age, heart disease was unlikely. [Tr. 20, 241].


Plaintiff visited Dr. Webster again on June 27, 2003. [Tr. 20, 238]. She complained of left sided pain from her neck to her arm, breasts, chest wall, flank, and legs. [Tr. 20, 238]. She also reported that she was doing better from an anxiety standpoint with the Klonopin, but that she had "backed off" from the Celebrex. [Tr. 20, 238]. She stated that she had not been taking anything for her fibromyalgia and did not think that the fibromyalgia was causing her pain. [Tr. 20, 238]. When Dr. Webster examined her, he noted that she weighed 228 pounds, her blood pressure was 110/80, and that her upper and lower extremity strength was 5/5. [Tr. 20, 238]. The doctor also

7

noted that she did not have any neurologic abnormalities, and that her complaints of left-sided weakness were not demonstrated on examination. [Tr. 20, 238].

On July 2, 2003, Plaintiff returned to WHA and was examined by Dr. Torres at Dr. Webster's request. [Tr. 20, 240]. Plaintiff complained of severe left neck pain that was radiating into her arm, leg, and chest wall. [Tr. 20, 240]. Treatment notes reveal that Dr. Torres concluded that "at this point, I see no reason for her not to continue working." [Tr. 240]. Dr. Torres also indicated that Plaintiff's neurological exam was completely normal except for brisk but nonpathologic reflexes. [Tr. 20, 240]. To rule out multiple sclerosis, an MRI of the brain was ordered and Plaintiff was started on Zonegran. [Tr. 20, 240]. Subsequently, on July 8, 2003, Dr. Steven R. Dennis performed an MRI scan of Plaintiff's brain and the results were normal. [Tr. 21, 122]. Notably, Plaintiff incorrectly reported to Dr. Webster that Dr. Torres determined that Plaintiff had multiple sclerosis and should not be working. [Tr. 20, 240].

Several weeks later, Plaintiff returned to WHA for a follow-up after the MRI. [Tr. 21, 236]. During her exam, Dr. Webster noted that Plaintiff's neurologic evaluation, MRI, and lab work was essentially normal. [Tr. 21, 236]. Dr. Webster also noted that she weighed 227 pounds and that her blood pressure was 120/80. [Tr. 21, 236]. Plaintiff reported that–because of her medications–she was not having any anxiety problems at all and was sleeping much better. [Tr. 21, 236]. The doctor diagnosed her with fibromyalgia and hyperlipidemia. [Tr. 21, 236]. He also took her off of the Celexa and prescribed Effexor. [Tr. 21, 236]. She was continued on the Zonegran, Klonopin, Skelaxin, Vicodin, and Nexium. [Tr. 21, 236]. The doctor referred her to physical medicine rehabilitation, and told her to continue working on her exercises and walking. [Tr. 21, 236].

Based on Dr. Webster's referral, Plaintiff visited Dr. John C. Liguori, a specialist in physical medicine and rehabilitation on July 31, 2003. [Tr. 21, 200]. Plaintiff's examination revealed that she was well-nourished, well-developed, and overweight. [Tr. 21, 201]. She did not have trouble getting from a seated to standing position, and she walked without ataxia or the need for an assistive device. [Tr. 21, 201]. She was in no acute distress, but her effect was slightly tearful at times. [Tr. 21, 201]. In addition, she had some tenderness at the trapezius, rhomboids, and iliolumbar area, but nonetheless demonstrated a full range of motion of her cervical and lumbar spine without pain. [Tr. 21, 201]. She also had a full range of motion of her extremities, and her deep tendon reflexes were 2/4 and equal bilaterally. [Tr. 21, 201]. Dr. Liguori diagnosed her with fibromyalgia exacerbation, depression, and anxiety. [Tr. 21, 201]. He prescribed Bextra and noted that the best treatment for her fibromyalgia was exercise. [Tr. 21, 201].

On August 5, 2003, Plaintiff reported that she had been started on the Bextra by Dr. Liguori and had noticed some improvement. [Tr. 21, 235]. Dr. Webster diagnosed Plaintiff with fibromyalgia, esophageal reflux, and depression related to fibromyalgia. [Tr. 21, 235]. He increased the dosage of the Effexor and directed her to follow-up in one month. [Tr. 21, 235].

A week later, Plaintiff reported for her physical therapy evaluation at Port City Physical Therapy Inc. on August 11, 2003. [Tr. 21, 141]. She was diagnosed with fibromyalgia, but it was noted that there was no evidence of a permanent impairment. [Tr. 21, 144]. It was also recommended that she undergo treatment 2-3 times per week for 4 weeks. [Tr. 21, 144]. Shortly after this visit, Plaintiff returned to see Dr. Liguori on August 20, 2003, for a follow-up. [Tr. 21, 199]. Dr. Liguori noted that Plaintiff had increased her range of motion and her sacral dysfunction

and mobility had been restored. [Tr. 21, 199]. Plaintiff denied any side effects from the Bextra, and she also denied any bowel or bladder problems, fevers, chills, night sweats, fatigue, or weakness. [Tr. 21, 199]. She stated that her main problem was not pain but rather fatigue. [Tr. 21, 199]. The examination revealed that Plaintiff was well-nourished, in no acute distress, and had no problem going from a seated to standing position. [Tr. 21, 199]. She had mild tenderness in the trapezius and rhomboids, but no tenderness in the thoracic, lumbar, paraspinal, or iliolumbar area. [Tr. 21, 199]. Plaintiff also had a full range of motion in her extremities, her strength was +5/5 and equal bilaterally. In addition, Plaintiff had negative straight leg raising, was neurologically intact, and was able to walk without an assistive device. [Tr. 21-22, 199]. Dr. Liguori diagnosed her with myofascial pain, fibromyalgia, and chronic fatigue. [Tr. 22, 199]. However, he also noted that both diagnoses were improving with the physical therapy and ordered her to continue the therapy for 2-3 times a week. [Tr. 22, 199].

Plaintiff consistently reported improvement during her physical therapy sessions. On August 25, 2003, she noted that she was "feeling good" and that her home exercise program was "doing well." [Tr. 22, 136]. On August 29, 2003, she stated that everything was going well, and that her exercises felt good. [Tr. 22, 135]. A couple of days later, on September 5, 2003, she stated that she felt "100% better since [she] started PT. . . ." [Tr. 22, 134]. On September 17, 2003, she reported that she was "feeling good." [Tr. 22, 132]. Likewise on September 29, 2003, Plaintiff indicated that she was trying to walk everyday as she did her exercises. [Tr. 22, 129].

On September 9, 2003, Plaintiff returned for a follow-up visit with Dr. Webster and reported rectal bleeding for a day. [Tr. 22, 233]. She also stated that the Effexor she had been taking "was

10

doing quite well for her depression" and that she had been "sleeping well." [Tr. 22, 233]. Dr. Webster diagnosed her with rectal bleeding, fibromyalgia, and noted that her depression was doing better. [Tr. 22, 233]. A few days later, Plaintiff had a consultation with Dr. Khaled Elraie at Dr. Webster's request. [Tr. 22, 232]. During the consultation, Dr. Elraie performed a gastroenterology to determine the cause of her rectal bleeding. [Tr. 22, 232]. Her examination revealed that she weighed 215 pounds, was in no acute distress, and had a normal mood and effect. [Tr. 22, 232]. The doctor ordered a colonoscopy. [Tr. 22, 232].

Plaintiff returned to Dr. Liguori for a follow-up visit on September 17, 2003. [Tr. 22, 197]. She told the doctor that her physical therapy had been going well. [Tr. 22, 197]. Her physical examination revealed that she was well-developed, well-nourished, and in no acute distress. [Tr. 22, 197]. Plaintiff's affect was bright and cheerful, she was alert and oriented times three, and she did not have any cognitive deficits. [Tr. 22, 197]. In addition, she had no problems getting from a seated to standing position, her gait was within normal limits, and she had a full range of motion in her extremities. [Tr. 22, 197]. Her grip strength was +5/5 and she was neurologically intact. [Tr. 22, 197]. Based on his examination, Dr. Liguori stated that Plaintiff was physically capable of working. [Tr. 22, 197]. However, he also noted that her cognitive deficits were not related to her fibromyalgia and that her depression may be an issue. [Tr. 22, 197]. The doctor recommended that Plaintiff continue with her physical therapy to work on her endurance and strength, and continue with the Bextra. [Tr. 22, 198].

On October 8, 2003, Plaintiff received a consultative psychological evaluation from Dr. Len Lecci, a clinical psychologist. [Tr. 22, 145-50]. During the evaluation, Plaintiff was alert,

cooperative, friendly, and able to relate effectively. [Tr. 22, 145]. She did not have any unusual posture, gait, or movements. [Tr. 22, 145]. Plaintiff reported that she was having restless sleep and dreaming non-stop, but denied current suicidal thoughts. [Tr. 22, 146]. She had not participated in outpatient therapy or hospitalization for mental health purposes. [Tr. 22, 146]. She indicated that she was homosexual, and had been in a relationship with a woman for six years, but lacked sexual desire for the past five years due to the pain from her fibromyalgia. [Tr. 22-23, 146]. Her daily activities included regular contact with her mother, brother, and best friend. [Tr. 23, 146]. She also socialized regularly with her friends by playing cards nearly every night and also frequently went out to eat. [Tr. 23, 147]. Furthermore, Plaintiff's daily activities included: microwaving her meals; washing her dishes; doing the laundry; vacuuming; and feeding and walking her dog. [Tr. 23, 147]. She also goes to the grocery store with her mother weekly. [Tr. 23, 147]. On a typical day, Plaintiff gets up at noon, drives to physical therapy, visits her friend, plays cards, returns home, does her physical therapy exercise, takes her dog for a walk, watches TV and then goes to sleep around 3 or 4 a.m. [Tr. 23, 147].

For her mental status exam, Dr. Lecci reported that Plaintiff was alert, responsive, and in contact with reality. [Tr. 23, 147]. She did not have poor impulse control, but her mood was upset, and her affect was sad and slightly anxious. [Tr. 23, 148]. Her thought processes were coherent and goal directed, and she was not distracted or evasive. [Tr. 23, 148]. Plaintiff denied any hallucinations. [Tr. 23, 148]. Dr. Lecci also noted that she was oriented to time, place, person, and situation. [Tr. 23, 148]. Her immediate retention of information was adequate, and her digit span forward and backward was significantly above the normal range. [Tr. 23, 148]. Her recent memory

and judgment was intact, she performed serial threes with only one mistake, and her insight was adequate. [Tr. 23, 148]. The doctor diagnosed her with major depressive disorder, single episode in partial remission, and indicated that her Global Assessment of Functioning ("GAF") was 65. [Tr. 23, 149].[1] As a result, he concluded that Plaintiff was able to perform simple, routine, and repetitive tasks. [Tr. 23, 150].

Plaintiff returned to Dr. Webster for a follow-up visit on October 14, 2003. [Tr. 23, 229]. During the visit, Plaintiff reported that she was doing well with physical therapy, but that she still had intermittent left arm pain symptoms. [Tr. 23, 229]. Her examination revealed that she had equal strength bilaterally with no reproducible pain. [Tr. 23, 229]. The doctor noted that she was stable on her course of medications, and that she remained very upbeat. [Tr. 23, 229].

The next day, Plaintiff returned to Coastal Rehabilitation Medicine Associates and was examined by physician's assistant, Latistia Gaston. [Tr. 23, 196]. Ms. Gaston noted that for Plaintiff's physical exam, she was well-developed, well-nourished, and in no distress. [Tr. 23, 196]. In addition, her affect was pleasant, she was in good spirits, and she was alert and oriented times four. [Tr. 23, 196]. Her motor examination was 5/5 in all extremities, her grip was 5/5 bilaterally, and her sensation was intact in all extremities. [Tr. 23, 196].

A month later, on November 12, 2003, Plaintiff was examined by Dr. Liguori for a follow-

---

[1] The Global Assessment Functioning ("GAF") scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The scale ranges from 0 to 100, with serious impairment in functioning at a score below 50. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). A GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), at 32 (4th ed. 1994) (emphasis in original omitted).

13

up. [Tr. 23, 195]. During the exam, Plaintiff reported that she was "getting good relief" with her neck pain and upper extremity pain. [Tr. 23, 195]. The doctor indicated that Plaintiff was well-developed, well-nourished, and in no acute distress. [Tr. 23, 195]. She also did not have any problems with position changes, but did have mild tenderness in the bilateral trapezius. [Tr. 23, 195]. In addition, she had a full range of motion in her upper extremities, her grip strength was +5/5, and she did not have any neurological deficits. [Tr. 23, 195]. Dr. Liguori diagnosed her with fibromyalgia and a history of cognitive deficits. [Tr. 23, 195].

On November 24, 2003, Dr. Alan Cohen, a State agency medical consultant, completed a physical RFC assessment. [Tr. 23, 151-58]. Dr. Cohen concluded that Plaintiff was capable of: 1) occasionally lifting fifty pounds; 2) frequently lifting 25 pounds; 3) standing and/or walking for 6 hours in an 8-hour workday; and 4) sitting about 6 hours in an 8-hour workday. [Tr. 23, 152].

Plaintiff returned to see Dr. Webster on December 1, 2003, with complaints of palpitations and tachycardia. [Tr. 23, 228]. She reported that she had been given a Sudafed prescription for her cold symptoms, and that her heart rate had been irregular since that time. [Tr. 23, 228]. However, her examination revealed a regular heart rhythm and rate. [Tr. 23-24, 228]. She was diagnosed with viral upper respiratory illness. [Tr. 24, 228]. Dr. Webster told her to stop taking the Sudafed. [Tr. 24, 228].

A few days later, Plaintiff was examined by DDS Psychological Consultant, Dr. Arlene Cook. [Tr. 24, 168]. Dr. Cook completed a "Psychiatric Review Technique" form under the category of Affective Disorders. [Tr. 24, 168]. She found that Plaintiff had mild limitations in activities of daily living and social functioning, and moderate difficulties in maintaining concentration,

persistence, or pace. [Tr. 24, 178]. However, she did not have any episodes of decompensation. [Tr. 24, 178]. That same day, Dr. Cook also completed a mental RFC assessment and concluded that Plaintiff could: 1) perform simple, routine, and repetitive tasks; 2) sustain and perform these tasks for two hours at a time; and 3) can adapt to changes and set realistic goals. [Tr. 24, 184].

On December 16, 2003, Plaintiff was examined by Dr. Webster and reported that she had been denied disability. [Tr. 24, 227]. Based on his treatment notes, the doctor indicated that Plaintiff could not work in her profession, "more than anything, with significant strenuous activity needed." [Tr. 24, 227]. He also noted that she had significant problems in her left arm, and that nerve conduction studies revealed carpel tunnel and ulnar neuropathy. [Tr. 24, 227]. However, her Holter monitor study was benign. [Tr. 24, 227]. Dr. Webster diagnosed her with stable fibromyalgia, stable gastroesophageal reflux, carpel tunnel syndrome, and stable irritable bowel syndrome. [Tr. 24, 227].

Plaintiff was examined by Dr. M. Angela Thomas on January 13, 2004. [Tr. 24, 192]. Dr. Thomas performed an electromyogram/nerve conduction study and she concluded that the findings were consistent with mild demyelinating median neuropathy, which could be compatible with carpel tunnel syndrome. [Tr. 24, 192]. The doctor also found that there was a slowing of the left ulnar motor nerve across the elbow, which suggested some ulnar nerve compression. [Tr. 24, 192]. However, there was no evidence of cervical radiculopathy. [Tr. 24, 192]. Dr. Thomas recommended conservative treatment for Plaintiff's carpel tunnel syndrome. [Tr. 24, 192].

A week later, on January 21, 2004, Dr. Paul Buongiorno completed a form entitled, "Medical Opinion re: Ability to do Work-Related Activities (Mental)." [Tr. 24, 186-88]. The doctor concluded that Plaintiff was unable to meet competitive standards to do unskilled work, semiskilled

15

and skilled work, and particular types of jobs. [Tr. 24, 186]. He also indicated that Plaintiff had severe physical and emotional limitations that affected all areas of her life including her activities of daily living. [Tr. 24, 187]. Finally, he opined that Plaintiff would be absent from work an average of more than four days per month. [Tr. 24, 188].

The ALJ included Dr. Buongiorno's opinion in his analysis, but afforded the opinion no weight. [Tr. 30-31]. Specifically, the ALJ noted that "there is no record that the claimant was actually seen by [Dr. Buongiorno] on this date or any date prior to August 12, 2004 (seven months later), when she underwent a mental status examination at the request of her legal representative." [Tr. 31]. The ALJ also noted that in the form, the Dr. Buongiorno "did not indicate any prior examinations or treatment of the claimant." [Tr. 31].

A week after Dr. Buongiorno's assessment, Plaintiff returned for a follow-up visit with Dr. Liguori on January 28, 2004. [Tr. 24, 189]. Dr. Liguori opined that Plaintiff was well-developed, well-nourished, overweight, but in no acute distress. [Tr. 24, 189]. She had a full range of motion of the left arm and shoulder, but she also had mild tenderness in the bicipital area of the left shoulder and deltoid. [Tr. 24, 189]. Her upper extremity strength was +5/5, she was neurologically intact, and her gait was within normal limits. [Tr. 24, 189]. Dr. Liguori diagnosed her with fibromyalgia, mild carpel tunnel syndrome of the left shoulder, possible early ulnar nerve compression of the left arm without symptomatology, and a history of subacromial bursitis. [Tr. 24, 189]. The doctor recommended that she return to see Dr. Scully for her increasing left shoulder pain, since he had helped her in the past with injections. [Tr. 24, 189]. He also recommended that she continue with the Bextra and her home exercise program. [Tr. 24, 189].

16

Plaintiff returned for a follow-up visit with Dr. Scully on March 2, 2004, complaining of severe upper left extremity pain. [Tr. 25, 205]. The doctor noted that "[a]bout the second sentence in the office, [Plaintiff] stated that she is applying for total disability and that she had been rejected twice." [Tr. 25, 205]. Although Plaintiff complained "vociferously of pain in the area of the biceps, Dr. Scully indicated that no abnormalities were identified on review of the MRI of this area. Ultimately, he had no explanation for the source of her ongoing complaints. [Tr. 25, 205]. In addition, although he suggested that the next best alternative was an evaluation at the University level, Plaintiff rejected this idea. [Tr. 25, 205]. Dr. Scully concluded that the source of her ongoing complaints remained obscure. [Tr. 25, 205]. He also wrote to Dr. Webster that he had no "rational explanation for the ongoing and severe pain" that Plaintiff has described, but that she does have secondary issues of pursuing total disability. [Tr. 25, 206].

On June 29, 2004, Plaintiff was examined by Dr. Scully's physician's assistant, John Hendrick. [Tr. 25, 207]. On examination, Mr. Hendrick noted that Plaintiff was very pleasant, cooperative, and in no acute distress. [Tr. 25, 207]. Furthermore, she had no swelling of the left knee, was minimally tender along the anterior joint line, had no tenderness of the medial joint line, and had a full range of motion with no pain. [Tr. 25, 207]. In addition, her ligaments were stable, she walked with a normal gait, and her anterior drawer and Lachman's were negative. [Tr. 25, 207]. Mr. Hendrick diagnosed Plaintiff with left knee internal derangement, but he also concluded that she did not appear to be very symptomatic. [Tr. 25, 207]. She was given an injection, and Dr. Scully electronically signed Mr. Hendrick's report. [Tr. 25, 207].

A month later, on July 27, 2004, Plaintiff was examined by Dr. Charles W. Lapp of the

Hunter-Hopkins Center. [Tr. 25, 213]. Plaintiff reported that she lived alone. For her daily and weekly activities she: drove; played with her puppy; folded clothes; shopped; played cards with her friends; read; watched television; talked on the phone; babysat; and walked every night about 3,000 feet. [Tr. 25, 213-14]. Dr. Lapp opined that Plaintiff's mental status exam was normal, her neck was supple, and she had a full range of motion. [Tr. 25, 214]. He also noted that her muscle tone was normal, she had no atrophy or synovitis, and she had a full range of motion in all of her joints. [Tr. 25, 215]. In addition, her Tinel's sign was absent bilaterally, her grip strength was decreased, and she had 12+ out of 22 tender points of fibromyalgia. [Tr. 25, 215]. For the cognitive tests, her serial sevens were performed with only two errors. [Tr. 25, 215]. Dr. Lapp diagnosed Plaintiff with fibromyalgia syndrome, chronic fatigue syndrome, sicca complex, periodontal disease, temporomandibular joint dysfunction, irritable bowel syndrome of the mixed type, hyperacidity/gastroesophageal reflux disorder, osteoarthritis of the knees, bilateral and mild carpel tunnel syndrome, mild left ulnar neuropathy, hypercholesterolemia, major affective disorder, and anxiety disorder. [Tr. 25-26, 216]. For his prognosis, he stated that Plaintiff "is clearly of limited ability and markedly impaired" and that "she is unable to perform even sedentary gainful work on a regular, sustained, or predictable basis." [Tr. 26, 215-16]. The ALJ afforded Dr. Lapp's opinion no weight because it was "inconsistent with his own clinical findings and the statements of the claimant." [Tr. 31]. Specifically, the ALJ noted that if an individual is "markedly impaired" and not capable of performing "even sedentary work," then they would also be unable to drive, play with their dog, go out during the week to play cards, walk every night, or grocery shop. [Tr. 31]. In addition, the ALJ noted that "one would not expect 'normal' muscle tone if a person was so

18

restricted and markedly impaired." [Tr. 31].

Plaintiff was evaluated by Dr. Buongiorno again on August 12, 2004. [Tr. 26, 312]. Her mood was depressed, and she was tearful, anxious, and in moderate distress. [Tr. 26, 312-13]. However, she had a regular speech rate and rhythm, she was coherent, and her stream of thought was logical. [Tr. 26, 313]. In addition, there was no evidence of hallucinations or delusions. [Tr. 26, 312]. Dr. Buongiorno diagnosed Plaintiff with severe major depression that was recurrent with agitated features. [Tr. 26, 313]. Also, he opined that her Global Assessment of Functioning was 50. [Tr. 26, 313]. Ultimately, the ALJ did not afford this report any weight because the doctor merely "based his findings on the subjective complaints of the claimant." [Tr. 31]. Moreover, Plaintiff's subjective complaints during this evaluation contradicted other statements she has made in the record as well as her testimony during the hearing in this matter. [Tr. 31].

The ALJ also considered a "Third Party Activities of Daily Living Questionnaire" form that was completed on November 12, 2003, by Yolanda Nixon. [Tr. 26, 94]. In the form, Ms. Nixon stated that she had known Plaintiff for ten years and saw her 3-4 times a week for one to two hours at a time. [Tr. 26, 94]. She related that she and Plaintiff would typically go out to eat or out shopping. In addition, Plaintiff watched videos with Ms. Nixon's four-year-old son. [Tr. 26, 94]. Ms. Nixon also indicated that Plaintiff spent a typical day: exercising; showering; dressing; playing with her puppy; reading; watching television; washing dishes; dusting the living room; and washing clothes. [Tr. 26, 94-95].

During the hearing in this matter, Plaintiff testified that she is unable to work due to left arm pain, fibromyalgia, and depression. [Tr. 26, 362-68]. She also indicated that she hurts all over and

has chronic pain in her ankles up to her thighs. [Tr. 26, 363]. She related that she has carpel tunnel syndrome in both hands and that she has trouble gripping things. [Tr. 26, 363-64, 372]. She noted that Dr. Torres diagnosed her carpel tunnel syndrome two to three years before and stated that surgery is the only option. [Tr. 26, 377]. Plaintiff indicated that a nerve conduction study was performed by Dr. Hartley in the past year, but she has not undergone any treatment for her carpel tunnel. [Tr. 26, 377-78]. She indicated that she is left-handed and could lift only one pound with her left arm. [Tr. 26, 362, 364].

In addition to her carpel tunnel, Plaintiff testified that she is tender in her knees, neck, back, and arm, and sometimes gets muscle spasms on the inside of her elbows. [Tr. 26, 364]. Plaintiff also indicated that she has restless leg syndrome at night and numbness/tingling in her left ankle and left hand. [Tr. 26, 364-65]. For treatment of her aches and pains, Plaintiff performs relaxation techniques, takes prescribed medications, uses a heating pad, and also over-the-counter creams. [Tr. 26, 365-66]. However, Plaintiff indicated that her pain medication does not always alleviate her symptoms. [Tr. 26, 366]. She also asserted that she lies in her recliner every fifteen to twenty minutes for thirty minutes at a time. [Tr. 26-27, 367]. Plaintiff reported that standing hurts her knees after about a half hour, but she can sit for about fifteen to twenty minutes, and she can walk five to ten minutes and then needs to rest. [Tr. 27, 370 - 71]. She also indicated that she can lift and carry about one pound, but it feels heavy. [Tr. 27, 368-69, 372]. When she sleeps, she has bizarre dreams, and at times has difficulty falling and staying asleep. [Tr. 27, 366]. She reported that she suffers from major depression, chronic pain, crying spells and cannot deal with stress; her pain increases with her stress level. [Tr. 27, 363, 373-74]. She related that she had started seeing a psychiatrist two

20

to three months before. [Tr. 27, 376-77]. She takes Wellbutrin and Klonopin for treatment. [Tr. 27, 377]. Plaintiff also testified that she lives alone. Although Plaintiff used to receive assistance from her mother with housekeeping duties, her mother became sick and is no longer able to help. [Tr. 27, 367]. Some of her daily and weekly activities consist of playing cards, grocery shopping, visiting friends, and reading. [Tr. 27, 371, 380-81]. She does chores such as microwaving meals, dishes, laundry, sweeping, mopping, and driving at least once a day. [Tr. 27, 278-80, 383-84]. She also does exercises twice a day, and has babysat in the past for a four-year-old child for two or three weeks. [Tr. 27, 381-382].

With regards to Plaintiff's testimony, the ALJ made the following findings:

The undersigned has carefully considered the claimant's statements about her symptoms with the rest of the relevant evidence in the case record. The undersigned finds that the claimant's allegations have been inconsistent with the medical evidence of record, the claimant's reports to her physicians, and the treatment sought and received.

Specifically, on November 13, 2003, a friend reported that she and the claimant went out to eat and to Wal-Mart. She noted that the claimant spent time with her four-year-old son watching videos, read, played with her puppy, washed dishes, dusted the living room, and washed clothes. She related that the claimant went to physical therapy about three times a week, grocery shopped once a week, and went out to visit three times a week. On October 8, 2003, the claimant reported she saw her best friend daily, and that she socialized with friends, played cards every night, washed dishes did the laundry, vacuumed, took care of her dog, grocery shopped weekly, watched television, and did physical therapy. On July 27, 2004, the claimant stated she drove, played with her dog, folded clothes, played cards, watched television, read, walked, babysat a four-year-old, and grocery shopped. At the hearing, the claimant testified she went out and played cards with friends, walked, cooked, grocery shopped, did stretching exercises, did the dishes, did the laundry, swept, mopped, and drove. She noted she flew to Pennsylvania in September 2003. She related visiting friends and going to the cafeteria. The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

There is evidence that the claimant stopped working for reasons not related to the

allegedly disabling impairments. On July 31, 2003, the claimant told Dr. Liguori that she quit work after an argument with he supervisor. On October 8, 2003, the claimant told Dr. Lecci, that she quit her job after being relocated to a job site that had more demands and fewer resources and she had an argument with her supervisor. On June 27, 2004, the claimant told Dr. Lapp, that the "last straw" was an argument with her supervisor and she "quit." Additionally, on March 2, 2004, Dr. Scully noted he had no explanations for her complaints and that the claimant ". . . does have secondary issues of pursuing total disability."

Despite the allegations of symptoms and limitations preventing all work, the claimant testified that she flew to Pennsylvania in September 2003 after the alleged onset date. Although a vacation and a disability are not necessarily mutually exclusive, the claimant's decision to go on a vacation tends to suggest that the alleged symptoms and limitations may have been overstated.

Although when asked about babysitting a four year old, the claimant testified that this was only for two or three weeks in June 2004, her friend reported in November 2003 that the claimant spent time with her four-year-old son looking at video games.

Although the claimant testified that the only option for treatment for the carpel tunnel syndrome is surgery, in July 2003, Dr. Torres' neurological examination was basically normal and she was started only started [sic] on Zonegran and no mention of surgery was made.

Although on October 8, 2003, the claimant told Dr. Lecci that she had no sexual desire and ". . . has not had a sex drive in five years . . ." she later told him she " . . . is homosexual and has been in a relationship with a woman for 6 years."

The undersigned finds that the testimony of the claimant is not fully credible concerning the severity of her symptoms and the extent of her limitations. Neither the severity nor the extent is supported by the objective medical evidence of record. [Tr. 27-28].

To determine what kinds of jobs that Plaintiff could perform based on her age, education, RFC, and work experience, the ALJ utilized testimony from VE, Dr. Dixon Pearsall. [Tr. 37]. Dr. Pearsall testified that despite Plaintiff's restrictions, she could work as a cashier (SVP 20), an attendant (SVP 2), and a parking lot cashier (SVP 2). [Tr. 37]. He also testified that his opinions were consistent with the Dictionary of Occupational Titles, and that he was aware of positions that could accommodate Plaintiff's sit/stand option because he had personally observed such positions.

[Tr. 37].

The undersigned shall now address Plaintiff's assignments of error.

## Assignments of Error

In her assignments of error Plaintiff argues that: 1) the ALJ's RFC assessment was erroneous; 2) the ALJ failed to assign appropriate weight to Dr. Lapp's opinion; 3) the ALJ failed to assign appropriate weight to Dr. Buongiorno's opinion; 3) the ALJ failed to assess Plaintiff's credibility in accordance with Social Security Ruling 96-7p; 4) the ALJ failed to assign weight to all of the medical opinions in the record; and 5) the ALJ should not have relied on the vocational expert's testimony in reaching his conclusions. [**DE-17, pgs. 12-28**]; [**DE-26, pgs. 5-6**].

Plaintiff's credibility determination argument essentially contends that the ALJ improperly weighed and/or evaluated the evidence before him. However, this Court must uphold the Defendant's factual findings if they are supported by substantial evidence. As a result, although Plaintiff may disagree with the ALJ's conclusions, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. For this reason, the Court will not analyze Plaintiff's assignment of error regarding her credibility. However, the Court will address Plaintiff's other arguments in turn.

1.    **RFC**

     a.    **Sit/stand option**

Plaintiff argues that the ALJ's failure to specify the frequency of her sit/stand option is an error that requires remand according to SSR 96-9p. [**DE-17, p. 13**]. Alternatively, she asserts that

a sit/stand option of any frequency will not allow her to work on a full-time basis because of her limitations. **[DE-17, p. 13].**

Social Security Ruling 96-9p states, "The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." 1996 SSR LEXIS 6, *19 (SSR 1996). Likewise, Social Security Ruling 83-12 recognizes that "[i]n cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base." 1983 SSR LEXIS 32, * 9-10 (SSR 1983).

During the hearing in this matter, the ALJ elicited testimony from the VE based on hypothetical questions that included the impairments and limitations that he found to be credible. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). One of these hypotheticals included a sit/stand at will option. [Tr. 387]. The VE testified that based on his personal and professional observations, there are three jobs that could accommodate this limitation: 1) cashier; 2) attendant cashier, and 3) cashier, parking lot type facility. [Tr. 388]. Thus, the ALJ's RFC assessment is consistent with both SSR 96-9p and SSR 83-12. The ALJ specified the frequency of Plaintiff's sit/stand option, and then consulted a vocational expert to determine if there were jobs available that could meet this requirement. Accordingly, Plaintiff's argument is without merit.

**b.    Low stress**

Plaintiff contends that the ALJ erred by finding that she is limited to "low stress" jobs and cites SSR 85-15 in support of her argument. **[DE-17, pgs. 13-14]**.

SSR 85-15 recognizes that individuals that suffer from mental illness may have difficulty adapting to the demands or "stress" in the workplace. 1985 SSR LEXIS 20, *14-15 (SSR 1985).

In fact, the ruling explains that because the reaction to work-related stress can be highly individualized, mentally impaired individuals may have "difficulty meeting the requirements of even so-called 'low stress' jobs." Id. at 16. As a result, the skill level of a position will not always be related to the difficulty an individual may encounter in meeting the demands of a job. Id. at 16. Nonetheless, the purpose of SSR 85-15 "is not intended to set out any presumptive limitations for [various mental] disorders, but to emphasize the importance of thoroughness in evaluation on an individualized basis." Id. 15.

In his decision, the ALJ concluded that because of Plaintiff's depression, she should only perform "low stress," "non-production" work. [Tr. 36]. To that end, the ALJ asked the VE to identify the kinds of jobs that could accommodate this limitation. [Tr. 387]. The VE testified that the three aforementioned jobs met this requirement. [Tr. 388]. Specifically, the VE reasoned that based on his experience, these jobs were consistent with the ALJ's hypothetical encompassing "low stress," "non-production" work. [Tr. 394]. Because the VE was only required to identify jobs that could accommodate Plaintiff's individualized needs, his testimony was consistent with SSR 85-15. Therefore, Plaintiff's argument is without merit.

c.    **Handling/Fingering**

Plaintiff challenges the ALJ's conclusion that she could perform frequent handling and fingering. [**DE-17, p. 14**]. Plaintiff asserts that this conclusion was erroneous because it contradicted the medical evidence in the record related to her carpel tunnel syndrome. [**DE-17, p. 14**]. However, in his decision, the ALJ specifically cited evidence that Plaintiff's carpel tunnel was described as "mild" and located in her left shoulder [Tr. 192], that the results for her neurological

examinations, MRI scans, and nerve conduction studies were "completely normal" [Tr. 197, 205, 236, 240], that she had +5/5 grip strength and +5/5 upper extremity strength on several examinations, [Tr. 189, 195, 196, 199, 229], that she had a full range of motion in all of her joints [Tr. 195, 197], and that her doctors only recommended "conservative" treatment of the condition [Tr. 192].Therefore, Plaintiff's argument is without merit.

## 2.     Dr. Lapp's Opinion

Plaintiff contends that the ALJ erred by failing to assign appropriate weight to Dr. Lapp's opinion. **[DE-17, pgs. 14-18]**. "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ dredged up 'specious inconsistencies,' or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, No. 98-114, 1999 U.S. App. LEXIS 307, *7 (4th Cir. 1999) (unpublished decision).

Based on a one-time consultative examination, Dr. Lapp concluded that Plaintiff was "clearly of limited ability and markedly impaired." [Tr. 215-16]. He also opined that Plaintiff would be "unable to perform even sedentary gainful work on a regular, sustained, or predictable basis." [Tr. 216]. In his decision, the ALJ did not give Dr. Lapp's opinion any weight. [Tr. 31]. He concluded that it was inconsistent with the doctor's clinical findings, as well as Plaintiff's other statements in the record. [Tr. 31]. For instance, the ALJ noted that an individual that is "markedly impaired" and not able to perform "even sedentary work" would not be able to drive, play with her dog, go out to play cards with her friends, take walks, or grocery shop. [Tr. 31, 213]. Furthermore, although Dr. Lapp opined that Plaintiff was severely restricted in her abilities, his treatment notes indicate that Plaintiff had "normal" muscle tone and "no atrophy".

26

The ALJ did not merely dredge up "specious inconsistencies" in the record, but provided viable reasons for rejecting Dr. Lapp's opinion. Therefore, Plaintiff's argument is without merit. Koonce, 1999 U.S. App. LEXIS at,*7.

**3.      Dr. Buongiorno's opinion**

Plaintiff's asserts that the ALJ erred by not giving appropriate weight to Dr. Buongiorno's opinion. [**DE-17, pgs. 18-20**].

Unlike Dr. Lapp, Dr. Buongiorno was Plaintiff's treating physician. In general, the ALJ should give more weight to a treating physician's opinion because this physician usually provides "a detailed, longitudinal picture" of a claimant's alleged impairments. 20 C.F.R. §§ 404.1527 (d)(2), 416.927(d)(2) (2008). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given a controlling weight.'" Craig, 76 F.3d at 590 (quoting Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

In his decision, the ALJ did not give any weight to Dr. Buongiorno's opinions from two of his reports. [Tr. 31]. The first report was from January 21, 2004. [Tr. 186-88]. In the report, the doctor opined that because of her mental impairments, Plaintiff would unable to meet any competitive standards for skilled, unskilled, and particular types of jobs. [Tr. 186-88]. He also stated that Plaintiff "had such severe physical and emotional limitations that [her] activities of daily living her live [sic] were affected." [Tr. 187]. However, the report did not provide the ALJ with adequate information to assess his opinion. For example, after each section within the report, it asked the

physician to explain the claimant's limitations and also include the medical/clinical findings that supported their assessment. [Tr. 186-88]. However, the only explanation that Dr. Buongiorno provided in the form was his opinion that Plaintiff suffered from extreme physical and emotional limitations; the rest of the report consisted of checked-off boxes. An ALJ is not required to afford a physician's opinion great weight if it is not supported by clinical evidence. Craig, 76 F.3d at 590.

In the mental status report in August 2004, Dr. Buongiorno indicated that Plaintiff was tearful, anxious, in moderate distress, and she had numerous depressive symptoms. [Tr. 313]. However, the ALJ explained that he discounted this report because it was "poor and minimal" and based primarily on Plaintiff's subjective complaints. [Tr. 31]. For instance, Plaintiff related that she was socially withdrawn and socially isolated, and Dr. Buongiorno assessed that her GAF was 50 on examination. [Tr. 312-13]. This GAF reflects serious impairments in social functioning. However, the ALJ noted that based on substantial evidence in the record, Plaintiff is capable of driving herself to places, visiting friends, playing cards with friends several times a week, going out to eat, as well as going out to shop. These types of activities are inconsistent with Dr. Buongiorno's findings.

In addition, Dr. Buongiorno's GAF assessment was also contradicted by other evidence in the record. He opined that Plaintiff's GAF of 50 was the highest it had been in the past year. However, just two weeks prior to his examination, in July 2004, Dr. Lapp concluded that Plaintiff's GAF was between 60-65. [Tr. 215]. Similarly, when Plaintiff was evaluated by Dr. Lecci in October 2003, he noted that Plaintiff's GAF was 65. [Tr. 149]. As noted above, GAF scores between 60-65 indicate mild to moderate symptoms, not serious impairments. Thus, the ALJ was permitted to weigh Dr. Buongiorno's opinions and conclude that because his opinions were inconsistent with

other evidence in the record, they were not entitled to any weight.  See Begley v. Astrue, No. 2:06cv00027, 2007 U.S. Dist. LEXIS 53119, at *29 (W.D. Va. 2007) (unpublished decision) (stating that "while an ALJ may not reject medical evidence for no reason or for the wrong reason, an ALJ may, under the regulations, assign little or no weight to a medical opinion, even one from a treating source, . . . if he sufficiently explains his rationale and if the record supports his findings") (internal citations omitted).  Accordingly, Plaintiff's argument is without merit.

### 4.    Other Medical Opinions in the Record

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he failed to indicate the weight he assigned to Drs. Lecci's and Liguori's opinions, as required by SSR 96-6p and SSR 96-2p. **[DE-26, pgs. 5-6]**.  Dr. Lecci is a State agency medical consultant who examined Plaintiff in October 2003.  Dr. Liguori is Plaintiff's treating physician and he examined Plaintiff several times over the course of two years.   SSR 96-6p, states that the ALJ "must explain the weight given to [the opinions of State agency medical and psychological consultants and other program physicians and psychologists] in their decisions." **[DE-26, p. 5]** (quoting 1996 SSR LEXIS 3, *5 (SSR 1996)).  However, the ALJ is not bound by their findings.  Id. at, *5.  SSR 96-2p states that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." 1996 SSR LEXIS 9, *11-12 (SSR 1996).

The ALJ's opinion is "sufficiently specific."  In his decision, the ALJ painstakingly discussed the substantial medical evidence that he used to support his conclusions.   As a result, Plaintiff's argument is without merit.  See Ngarurih v. Ashcroft, 371 F.3d 182, 191, n.8 (4th Cir.

2004) (stating that "reversal is not required when the alleged error 'clearly had no bearing on the procedure used or the substance of the decision reached.'") (quoting Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 95 (1943)); see also, Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. Ill. 1989) (concluding that "[n]o principle of administrative law or common sense requires [the court] to remand a case in [a] quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

**5.      Vocational Expert Testimony**

For Plaintiff's final assignment of error, she challenges the ALJ's reliance on the VE's testimony for several reasons.  First, she asserts that "the ALJ's hypothetical failed to include an accurate description of [her] limitations." **[DE-17, p. 25]**.  Second, she contends that the jobs that the VE cited were not suitable because, "they do not allow the worker to alternate sitting and standing 'at will.'" **[DE-17, p. 25]**.  Third, she argues that the jobs the VE identified were inconsistent with her RFC, which limits her performance to simple, one-two step tasks. **[DE-17, p. 26]**.  For the reasons stated below, the Court concludes that these arguments are without merit.

During a hearing, a VE utilizes his or her expertise to assist the ALJ in determining whether there is work in the national economy that a claimant can perform.  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).  Thus, "[i]n order for a [VE's] opinion to be relevant or helpful, it must be based on a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. Id.  (citing Stephens v. Secretary of Health, Educ. and Welfare, 603 F.2d 36 (8th Cir. 1979)). However, the hypothetical

presented to a VE need only include the impairments and limitations that the ALJ finds credible. See Mickles v. Shalala, 29 F.3d 918, 929 (4th Cir. 1994) (Luttig, J., concurring) (noting that in the hypothetical to the vocational expert, the ALJ did not include the restrictions alleged by the claimant because he "found those allegations to be incredible"). To that end, "a hypothetical question is unimpeachable if it *adequately reflects* a residual functional capacity for which the ALJ had sufficient evidence." Fisher v. Barnhart, 181 Fed. Appx. 359, 364 (4th Cir. 2006) (unpublished decision) (citing Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005)) (emphasis in the original).

In this case, the hypothetical question posed to the VE by the ALJ was based on a RFC determination supported by substantial evidence. Therefore, it accurately reflected all of Plaintiff's limitations. In addition, although the jobs that the VE cited do not discuss a sit/stand at will option, the ALJ specifically questioned the VE about this issue. In response, the VE testified that based on both his personal and professional observations, these jobs would be able to accommodate this limitation. [Tr. 388]. "Vocational experts . . . are employment experts who know the . . . physical demands of different types of work." Fisher, 181 Fed. Appx. at 365. Thus, it was reasonable for the ALJ to rely on the VE's expertise and experience with regards to the sit/stand option. See id., (stating that a VE's conflicting testimony can be relied on if it is based on the expert's own "'experience in job placement or career counseling'") (quoting 2000 SSR LEXIS 8, *6 (SSR 2000)).

During the hearing, the ALJ specifically inquired whether the reasoning levels for the jobs that the VE identified were consistent with simple, one, two-step functions. [Tr. 392]. The VE affirmed that they were, but Plaintiff's attorney wanted a further explanation about the apparent discrepancy. The following exchange took place:

VE: The reasoning levels in jobs are not lined up, you know, specifically with the functions of the jobs. So it's been an ongoing discussion in many circles. In my opinion, these jobs are one and two-step level jobs.

By Attorney:

Q: Although that conflicts with the Dictionary of Occupational Titles?

A: I do not see it as conflicting with the Dictionary of Occupational Titles. Then we'd get into the whole issue of whether it conflicts. . .

Q: Well, if the Dictionary of Occupational Titles thought that these jobs were simple one and two step, wouldn't they assign reasoning level one?

A: No . . . when you get into one and two-step functions of the job, it's breaking jobs down into their component parts and the actual job is the activity that's done. And these are simple one and two-step activities. You know, you're taking money and making change. That's a two-step function. Whereas the higher level of reasoning involved multiple aspects of processing and all that sort of thing. So there is no job unless you are – it's going to be just one or two-steps when you're doing this, you know, you're picking up something and leaving it here all day long. There can always be interjections with other things that you have to do during the day, but that doesn't make the job higher than a one or two-step function job. It's the components of the job having one or two functions not the title job. It might have multiple tasks, but they are one and two-step functions.

[Tr. 392-93].

Plaintiff argues that the Court should not accept the VE's testimony where it contradicts the D.O.T. [DE-26, p. 9]. The Fourth Circuit has held that "'[w]hen there is an apparent unresolved conflict between [vocational expert] evidence and the [Dictionary of Occupational Titles], the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled.'" Fisher, 181 Fed. Appx. at 365 (quoting 2000 SSR LEXIS 8, *6 (SSR 2000)). To that end, the ALJ must "inquire, on the record, as to whether there is such consistency." Id. Neither the DOT nor the vocational expert's testimony will automatically trump when there is a conflict. Id. Instead, the ALJ

must resolve the conflict by determining whether the vocational expert's explanation is reasonable. Id. Examples of reasonable explanations can involve testimony that is based on "other reliable publications" or the vocational expert's own "experience in job placement or career counseling." Id. In addition, because the DOT "lists maximum requirements of occupations as generally performed, not the range of requirements as it is performed in a specific setting," the vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." 2000 SSR LEXIS 8, *6 (SSR 2000).

The record reflects that the ALJ complied with SSR 00-4p by asking the VE about the consistency between his testimony and the DOT. In addition, even though the VE did not believe there was a "conflict" with his findings, he provided a reasonable explanation for the apparent inconsistency. Specifically, he noted that based on his own professional experience, he believed that the reasoning levels in the DOT did not always match up with the job requirements for certain jobs. According to SSR 00-4p, this qualifies as a reasonable explanation. See id., (stating that a VE "may be able to provide more specific information about jobs or occupations than the DOT"). Therefore, Plaintiff's arguments regarding the VE's testimony are without merit.

## Conclusion

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-16]** be DENIED, the Defendant's Motion for Judgment on the Pleadings **[DE-24]** be GRANTED, and the final decision by the Defendant be AFFIRMED.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 9th day of February, 2009.

William A. Webb
U.S. Magistrate Judge